IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK S., on behalf of himself and as parent and guardian of his minor child, A.S., and on behalf of all other similarly situated individuals, | ) ) ) ) | |
| | ) | Case No. 19 C 8068 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Martha M. Pacold |
| | ) | |
| COLLEGE BOARD, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO AMENDED MOTION TO ENFORCE ARBITRATION AGREEMENTS AND STAY PROCEEDINGS AND ITS DEMAND FOR A JURY TRIAL**

Dated: July 2, 2020

Respectfully submitted,

MARK S., on behalf of himself and as parent and guardian of his minor child, A.S., and on behalf of all other similarly situated individuals,

By:     /s/ Scott R. Drury
        SCOTT R. DRURY
        *One of Plaintiff's Attorneys*

Michael Kanovitz
Gayle Horn
Scott R. Drury
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
312.243.5900
mike@loevy.com
gayle@loevy.com
drury@loevy.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION .........................................................................................................1

FACTUAL BACKGROUND ........................................................................................2

ARGUMENT ...............................................................................................................8

I.      Legal Standards ..............................................................................................8

II.     Defendant Has Not Met Its Burden of Showing a
        Valid Arbitration Agreement ..........................................................................9

        A.      By Taking the PSAT, A.S. Did Not Agree to Arbitration,
                and Any Agreement Would Be Unconscionable ...................................10

        B.      By Taking the 2019 AP Exams, A.S. Did Not Agree to
                Arbitration, and Any Agreement Would Be Unconscionable ..............13

        C.      A.S. Did Not Agree to Arbitrate in Connection with the
                2020 AP Exams, and Any Agreement Would Be
                Unconscionable ....................................................................................16

                1.  My AP ...........................................................................................16

                2.  2020 AP Exams ..............................................................................17

III.    The Arbitration Provisions Are Inapplicable .................................................18

IV.     While A.S. Can Disaffirm Contracts, There Are None to Disaffirm .................19

CONCLUSION ...........................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Allscripts Healthcare, LLC v. Etransmedia Tech, Inc.*,
188 F.Supp.3d 696 (N.D. Ill. 2016) .................................................................12

*Bank of Com. v. Hoffman*, 829 F.3d 542 (7th Cir. 2016) ...............................15

*Biederman v. O'Connor*, 7 N.E. 463 (Ill. 1886) ............................................20

*Bloom v. ACT, Inc.*, No. CV 18-6749-GW(SSx) (C.D. Cal. Mar. 7, 2019)...................................19

*Brody v. Finch Univ. of Health Sciences/The Chicago Med. School*,
698 N.E.2d 257 (Ill. Ct. App. 1998) ...................................................9, 13, 14

*C.M.D. ex rel. DeYoung v. Facebook, Inc.*, 621 F.App'x 488 (9th Cir. 2015)............................20

*Cabrini-Green Local Adv. Council v. Chicago Housing Auth.*,
No 04 C 3792, 2008 WL 4679364 (N.D. Ill. May 30, 2008) ......................19

*Chevron Corp. v. Ecuador*, 795 F.3d 200 (D.C. Cir. 2015) ............................12

*Contec Corp. v. Remote Solution Co.*, 398 F.3d 205 (2d Cir. 2005) ...............12

*Contempo Design, Inc. v. Chicago and N.E. Ill. Dist. Cncl. of Cptrs.*,
226 F.3d 535 (7th Cir. 2000) ..........................................................9, 14, 16, 17

*Crown Mortg. Co. v. Young*, 989 N.E.2d 621 (Ill. App. Ct. 2013)..................11

*Doe v. The College Board*, No. 19 Civ. 6660 (LGS)
2020 WL 8822019 (S.D.N.Y. Feb. 24, 2020).........................................12, 13

*Doyle v. Holy Cross Hosp.*, 708 N.E.2d 1140 (Ill. Ct. App. 1999) .................9

*Durrett v. ACT, Inc.*, 310 P.3d 1047 (Haw. Ct. App. 2011) ...........................20

*E.K.D. ex rel. Dawes v. Facebook, Inc.*,
885 F.Supp.2d 894 (S.D. Ill. 2012)...................................................................20

*Franks Maint. & Eng'r Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403 (Ill. 1980)..............................10

*Harden v. Am. Airlines*, 178 F.R.D. 583 (M.D. Ala. 1998)............................20

*Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S.Ct. 524 (2019) ..................................12

*Hunter v. Egolf Motor Co.*, 268 Ill.App. 1 (Ill. Ct. App. 1932)......................................................19

*Iverson v. Scholl, Inc.*, 483 N.E.2d 893 (Ill. App. Ct. 1985) ....................................................19

*Johnson v. Uber Tech., Inc.* No. 16 C 5468,
2017 WL 1155384 (N.D. Ill. Mar. 3, 2017).................................................................. *passim*

*Kinkel v. Cingular Wireless, LLC*, 857 N.E.2d 250 (Ill. 2006) ...................................11, 12, 13, 18

*KMK Group, LLC v. Helco Corp.*, 380 F.Supp.3d 790 (N.D. Ill. 2019) .....................................15

*Mecum v. Weilert Custom Homes*, 239 F.Supp.3d 1093 (N.D. Ill. 2017) .......................................8

*Nandorf, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*,
410 F.3d 882 (N.D. Ill. 2019) .......................................................................................12

*Nettles v. Blatt, Hasenmiller, Leibsker & Moore LLC*, No. 18-cv-7766
2019 WL 4750297 (N.D. Ill. Sept. 30, 2019) ................................................................8, 9

*Ogle v. Hotto¸* 652 N.E.2d 815 (Ill. Ct. App. 1995) ....................................................................14

*Oracle Am., Inc. v. Myriad Grp A.G.*, 724 F.3d 1069 (9th Cir. 2013)..........................................12

*Petrofac, Inc. v. DynMcDermott Pet. Operations Co.*, 687 F.3d 671
(5th Cir. 2012).............................................................................................................12

*Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006), ...................................................12

*Razor v. Hyundai Motor Am.*, 854 N.E.2d 607 (Ill. 2006)........................................................10, 11

*Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016) ......................................9, 10, 17, 18

*Sheller ex rel. Sheller v. Frank's Nursery & Crafts, Inc.*,
957 F.Supp. 150 (N.D. Ill. 1997) .................................................................................20

*Terminex Int'l Co. v. Palmer Ranch LP*, 432 F.3d 1327 (11th Cir. 2005) ...................................12

*Weber-Stephen Products Co. v. U.S. Die Casting and Develop.*,
No. 89 C 329, 1989 WL 105223 (N.D. Ill. Sept. 1, 1989)............................................14

*Weisbrook v. Clyde C. Netzley, Inc.*, 374 N.E.2d 1102 (Ill. Ct. App. 1978)................................19

*Zwayer v. Ford Motor Credit Co.*, 665 N.E.2d 843 (Ill. App. Ct. 1996)................................13, 17

## STATUTES

9 U.S.C. § 3......................................................................................................................8

9 U.S.C. § 4......................................................................................................................8

## INTRODUCTION

Defendant College Board is a standardized testing company with over $1 billion in annual revenues,[1] a portion of which derived from Defendant's unlawful and deceptive scheme to collect, sell and disseminate students' personal data to third parties. Defendant collected the data when, *inter alia*, students visited its website, registered for online accounts or took exams. Like millions of others, A.S. was one of the students Defendant took advantage of.

Defendant now seeks to compel A.S. to arbitrate and stay this litigation. According to Defendant, A.S. entered into eight arbitration agreements. The facts and law belie the contention. A.S. did not unambiguously assent to any of the purported agreements or, at minimum, a factual dispute exists. Moreover, with respect to six of the purported agreements, preexisting implied-in-fact contracts govern the parties' relationship and do not contain arbitration provisions. Defendant's attempt to unilaterally and coercively modify those contracts fail for lack of new consideration. Additionally, the totality of the circumstances shows that Defendant used heavy-handed methods to get students to purportedly enter into the arbitration agreements, making the agreements procedurally unconscionable; and the terms themselves are substantively unconscionable. Finally, even if A.S. entered into any of the arbitration agreements, those agreements do not cover the conduct alleged in the First Amended Complaint.

For each of these reasons, the Court should deny the motion and for any disputed issue of material fact order a jury trial.

---

[1] College Board 2018 IRS Form 990, available at https://projects.propublica.org/nonprofits/display_990/131623965/01_2020_prefixes_06-13%2F131623965_201812_990_2020012717070895 (last accessed July 2, 2020).

## FACTUAL BACKGROUND

### *Nature of the Case*

This case arises out of Defendant's alleged scheme to unlawfully collect, sell and disseminate student data. Dkt. 55 ¶¶ 15-39. As alleged, Defendant collected the data in myriad ways, including when students visited its website or registered for online accounts. *Id.* ¶¶ 19-24.

### *A.S.*

A.S. is a minor child under sixteen and an outstanding high school student who follows teachers' and exam proctors' directives. *See* Exhibit 1 (Declaration of A.S.) ¶¶ 1-3. A.S. has taken six Advanced Placement ("AP") classes and five AP Exams, as well as two PSAT 8/9 ("PSAT") Exams. *Id.* ¶_. Defendant offered its AP program, which included AP classes, through A.S.'s school. *See* Dkt. 60-6 (Hardy Decl.) (Defendant providing AP materials to school); Exhibit 2 at 1 (description of College Board programs). A.S. prepared for months for each AP Exam. *Id.* ¶ 8. Each exam was very stressful. *See id.* ¶ 9. A.S. has visited Defendant's website and has an online College Board Account. *Id.* ¶ 10.

### *PSAT 8/9*

The State of Illinois and A.S.'s school mandated that A.S. take the PSAT. Dkt. 60-15, 60-16 (PSAT Answer Sheets); *see also* Exhibit 3 (6/18/2018 Ill. State Bd. of Ed. Ltr.); Exhibit 4 (School Memo). A.S. has no record or recollection of receiving a copy of the *2018-2019 PSAT 8/9 Student Guide* (the "*Student Guide*") and has not reviewed it. *Id.* ¶ 4. Defendant has offered no evidence showing that it provided A.S. with the *Student Guide.*

The PSAT answer sheet contained the following "Certification Statement": "I confirm I am the person listed on the answer sheet and agree to follow the test guidelines and regulations."

Dkt. 60-15, 60-16. The answer sheet did not specifically identify what those "guidelines and regulations" were or where they could be found. *See* Dkt. 60-15, 60-16.

The *Student Guide*, which A.S. did not receive, contained a section titled "Test Regulations." Dkt. 60-17 at 7.[2] The "Test Regulations" did not include an arbitration provision. *See id.* Rather, an arbitration provision was set forth in a different section of the *Student Guide* titled "Additional Policies." *Id.* at 8.

While students were seated for the PSAT Exams, the exam proctor read the above-referenced "Test Regulations" to the students. Exhibit 5 (*2018-2019 PSAT 8/9 Coordinator Manual*) at 61. The proctor did not read or reference the "Additional Policies." *See id.* In addressing the "Certification Statement," the proctor made no mention of an arbitration agreement:

> Now please find the Certification Statement on the back of your answer sheet.
>
> By signing the statement, you are agreeing not to share any specific test question with anyone, in any form of communication, including email, text message, internet posts, or other use of the internet. Doing so may result in score invalidation or other possible sanction. In addition, you agree that if your school provided any information about you to the College Board, the College Board may retain that information to provide the educational services related to this test, such as score reporting and scholarship eligibility and opportunities.

*Id.* at 65. The answer sheets contained the same language. Dkt. 60-15, 60-16 at 5. The proctor directed the students to sign the Certification Statement: "Read the statement, then sign your full name as you would an official document." Ex. 5 at 65. The proctor emphasized "Please be sure to complete this section." *Id.* A.S. followed the proctor's directive. *See* Dkt. 60-15, 60-16 at 5.

### The 2019 AP Exams

Through its AP Program, Defendant offered A.S. the chance to take AP courses and exams and earn college credit. Ex. 1 ¶ 7; Ex. 2. Prior to beginning the 2018-2019 school-year, A.S. signed

---

[2] Where documents have previously been filed on the docket, citations are to ECF page numbers.

up for three AP classes that Defendant offered through A.S.'s school. Ex. 1 ¶¶ 5, 7. On March 29, 2019, A.S., via A.S.'s parents, paid $282 ($94/exam) to take three AP Exams. Exhibit 6 (3/29/2019 Payment Receipt). Defendant directed A.S.'s school to collect payment in the school's name. Exhibit 7 *(2018-2019 AP Coordinator's Manual)* at 23. Defendant paid the school $9 for each exam fee collected.[3] *See id.* A.S. paid the exam fees in order to take the AP Exams and receive a score. Ex. 1 ¶ 7.

On April 26, 2019, A.S.'s school sent A.S. a lengthy, single-spaced email with AP Exam information. Exhibit 8 (4/26/2019 email). The email largely provided logistical information, emphasizing in bold: (a) that A.S. should not be late; (b) the items A.S. should and should not bring; and (c) that A.S. could not leave the exam early. *Id.* The last sentence of the email noted in plain text that A.S. should review the *2018-2019 Bulletin for AP Students and Parents* (the "*2018-2019 Bulletin*"), which were attached. *Id.* The email did not state that the *2018-2019 Bulletin* contained contractual terms, including an arbitration agreement, that Defendant would later contend A.S. accepted. *See id.* A.S. did not read the *2018-2019 Bulletin*. Ex. 1 ¶ 11.

A.S. took three AP Exams in 2019. *Id.* ¶ 5. Exam proctors directed students to "Follow the directions as I read them." Exhibit 9 (*2018-2019 AP Exam Instructions* (the "*AP Instructions*") at 18. They further directed students to "Look at the statement above Item A [on the answer sheet], Signature, and read it carefully . . . . ***Now sign your legal name and print the date where indicated. You must do this each time you take an AP Exam.***" *Id.* at 19 (emphasis added). The statement at issue required students to "maintain the security of the exam and the validity of my AP score":

> I am aware of and agree to follow the policies and procedures in the *2018-2019 Bulletin for AP Students and Parents* to maintain the security of the exam and the validity of my AP score. I understand and accept that my exam score may be cancelled if I do not follow these policies and procedures. If I disregard any exam

---

[3] Defendant referred to the payment as a "rebate," even though any actual rebate should have gone to the students or their parents, as they were the ones who paid the fee.

day instructions, or if my exam is administered improperly, I certify that I am the person whose information appears on this answer sheet.

Dkt. 60-2 to 60-4 at 2 (2018-2019 AP answer sheets). A.S. has no recollection of anyone providing A.S. with the *2018-2019 Bulletin* during any of the 2019 AP Exams. Ex. 1 ¶ 11.

The *2018-2019 Bulletin* had a section titled "Test Security and Administration Policies and Procedures" that addressed AP Exam security and test score validity. Dkt. 60-7 (*2018-2019 Bulletin*) at 6-7. A separate section titled "Disputes" contained an arbitration provision. *Id.* at 7-8.

### The 2020 AP Exams

Prior to beginning the 2019-2020 school-year, A.S. signed up for three AP classes that Defendant offered through A.S.'s school. Ex. 1 ¶¶ 6-7. Through A.S.'s parents, A.S. paid a total of $282 to take three 2020 AP Exams ($94 each) and receive a score. *Id.* ¶7; Ex. 10 (8/12/2019 Payment Receipt). At Defendant's direction, A.S.'s school accepted payment in its own name and received $9 for each payment collected.[4] Exhibit 11 (*2019-2020 AP Coordinator's Manual*) at 20.

At Defendant's direction, when school commenced, A.S.'s AP teachers required students to create "My AP" accounts in order to access practice exams and class assignments. *See id.* at 3-4, 68, 107; Ex. 1 ¶ 13. Defendant instructed schools to make "My AP" registration a school assignment – signing up was not optional. *Id.* at 68, 107; Ex. 1 ¶ 13.

Students registering for My AP had to "accept" onerous terms that were internally inconsistent and confusing. *See* Dkt. 60-8 ¶¶ 2-4. The first screen presented to students gave no indication that the terms contained an arbitration provision. *Id.* ¶ 2. Moreover, the first screen represented that the terms solely governed "access to and use of the AP Registration and Ordering system, the AP Classroom system and/or the Pre-AP Classroom system, and My AP." *Id.* Yet,

---

[4] Due to the COVID-19 pandemic, A.S.'s school district later agreed to pay for students' AP Exams. A.S. does not know if the payment has been made. Ex. 1 ¶ 7.

buried in § 17, Defendant set forth a much broader arbitration provision that covered any disputes "that relate in any way to registering for or taking part in a College Board program . . . ." *Id.* ¶ 3.

A.S. took two AP Exams in May 2020. Ex. 1 ¶ 6. A.S. has no recollection or record of receiving a copy of the *2019-2020 AP Bulletin for Students and Parents*. *Id.* ¶ 14. A.S. has never read that *Bulletin. Id.*

Prior to taking the exams, A.S., by her attorneys, informed Defendant that A.S. did not agree to arbitrate any claims against Defendant and that, if forced to "accept" an arbitration agreement, A.S. would do so under duress and protest and reserved all rights:

> By taking the upcoming 2020 AP Exams, neither [A.S.] nor any putative class member agrees to arbitrate any claims they may have against College Board. To the extent [A.S.] or any putative class member is forced to accept any terms in order to take any 2020 AP Exam, they are doing so under duress and under protest, and they reserve all rights.

Dkt. 60-14 (5/12/2020 Drury Letter); *see also* Exhibit 12 (4/30/2020 Drury letter).

Defendant administered the 2020 AP Exams online. Shortly before the exams, Defendant sent A.S. an email that largely provided logistical information regarding the exams. Exhibit 13 (5/4/2020 College Board email). In bold text and separate sections, Defendant emphasized: (a) the test dates and times; (b) ways to prepare for the tests; (c) test security; and (d) upcoming items. In the email's last section, Defendant noted in plain text that A.S. could review the AP Exam's terms and conditions which she would need to accept on exam day. *Id.* The email also linked to a demo exam but gave no indication that the demo included the AP Exam's terms. *See id.*

According to Defendant, when A.S. took a 2020 AP Exam, A.S. was first confronted by a registration page that gave A.S. five minutes to: (a) complete eight separate fields; (b) determine whether to allow Defendant "the unlimited right" to use and publish A.S.'s work product; (c) review lengthy legal terms, including a purported arbitration provision; and (d) leave the

examination's website in order to review the AAA Consumer Arbitration Rules (the "AAA Rules") referenced in the terms. *See* Dkt. 60-8 (Clewley, Jr. Declaration) ¶¶ 11-12, 14-16; Exhibit 14 (2020 AP Terms and Conditions); *see* Dkt. 60-14. Defendant placed a timer in the corner of the screen that counted down from five minutes. *See id.* ¶¶ 14-15 (showing timer). Further, even though Defendant knew A.S. did not agree to arbitration, Defendant blocked A.S. from accessing the AP Exams unless A.S. "accepted" Defendant's terms. *See id.* ¶ 15; Dkt. 60-14.

***The Arbitration Clauses and Dispute***

According to Defendant, A.S. has agreed to three separate arbitration provisions that, in relevant part, provided as follows:

> ***Arbitration Provision 1***: [A]ll disputes **against the College Board and/or any or all of its contractors**, that relate in any way to registering for or taking the PSAT 8/9, including but not limited to receiving test accommodations, score reporting, and the use of test taker data, shall exclusively be resolved by a single arbitrator . . . . (Dkt. 60-17 at 8) (emphasis in original)

> ***Arbitration Provision 2***: [A]ll student disputes against the College Board and/or any or all of its contractors, that relate in any way to registering for or taking part in a College Board program such as AP or Pre-AP, including but not limited to requesting or receiving test accommodations, score reporting, and the use of test taker data, shall exclusively be resolved by a single arbitrator . . . . (Dkt. 60-7 at 8)

> ***Arbitration Provision 3***: [A]ll disputes between you and College Board and/or any or all of its contractors that relate in any way to registering for or taking the AP Exam, including but not limited to requesting or receiving test accommodations, score reporting, the use of your data, test security issues, or the Score Validity Process . . . shall exclusively be resolved by a single arbitrator . . . . (Ex. 14 at 7).

Additionally, each arbitration provision required students to waive any right to bring a class action without the ability to opt out and referenced the AAA Rules. Dkt. 60-17 at 8; Dkt. 60-7 at 8; Ex. 14 at 7. Moreover, Arbitration Versions 1 and 2 mandated that: (a) any arbitration be held in New York, unless the parties mutually agreed to an alternate location; and (b) each party pay its own fees and expenses. Dkt. 60-17 at 8; Dkt. 60-7 at 8. Arbitration Version 3 provided that: (a)

the arbitration would take place at a "reasonably convenient" location or, if no agreement could be reached, by document submission, video or telephonic call; and (b) Defendant would pay the arbitration filing fee, but each party would pay its own fees, legal fees and expenses. Ex. 14 at 7.

On February 4, 2020, Defendant sought to compel arbitration. Dkt. 60-18 (2/4/2020 Arbitration Demand). At all times, Plaintiff has refused that demand.

**ARGUMENT**

## I.    Legal Standards.

Section 4 of the Federal Arbitration Act ("FAA") governs a party's refusal to arbitrate under an alleged written agreement.[5] 9 U.S.C. § 4. Before ordering arbitration, a court must satisfy itself that "the making of the agreement for arbitration or the failure to comply therewith is not an issue." *Id.* If those items are at issue, "the court shall proceed summarily to the trial thereof." *Id.* The party alleged to be in default may demand a jury trial, which Plaintiff does here. *Id.*

"The party seeking to compel arbitration has the burden of establishing an agreement to arbitrate," a dispute falling within the scope of the agreement, and the non-movant's refusal to arbitrate. *Nettles v. Blatt, Hasenmiller, Leibsker & Moore LLC*, No. 18-cv-7766, 2019 WL 4750297, at *2 (N.D. Ill. Sept. 30, 2019); *Mecum v. Weilert Custom Homes*, 239 F.Supp.3d 1093, 1095 (N.D. Ill. 2017). If a movant carries its burden, the nonmovant must show that the arbitration agreement is unenforceable, or the claims fall outside the agreement. *Mecum*, 239 F.Supp.3d at 1095. A "quasi-summary judgment standard" applies to motions to compel arbitration. *Johnson v. Uber Tech., Inc.* No. 16 C 5468, 2017 WL 1155384, at *2 (N.D. Ill. Mar. 3, 2017). The court views

---

[5] While titled a motion to "enforce" arbitration agreements, Defendant seeks to compel arbitration. Section 3 of the FAA, cited by Defendant, does not provide for that relief. It merely allows a court to stay a proceeding if an arbitration agreement exists. *See* 9 U.S.C. § 3. Section 4 addresses motions to compel. *See* 9 U.S.C. § 4. Because Defendant seeks relief not permitted by FAA § 3, the Court should deny the motion.

8

the evidence in the light most favorable to the party opposing arbitration and draws all reasonable inferences in that party's favor. *Nettles*, 2019 WL 4750297, at *2.

## II. Defendant Has Not Met Its Burden of Showing a Valid Arbitration Agreement.

Because "arbitration is a creature of contract," a court must first determine whether the parties agreed to arbitrate. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016). While it has been said that federal policy favors arbitration, in actuality, federal law merely places arbitration agreements on equal footing with other contracts. *Nettles*, 2019 WL 4750297, at *2. Courts interpret arbitration agreements as they would any contract. *See Sgouros*, 817 F.3d at 1034-35 (applying Illinois contract law). Whether parties entered into a binding arbitration agreement is governed by state contract law. *Nettles*, 2019 WL 4750297, at *2.

Disputes over contract formation are generally decided by the courts. *Johnson*, 2017 WL 1155384, at *1. A contract requires an offer, acceptance and supporting consideration. *Brody v. Finch Univ. of Health Sciences/The Chicago Med. School*, 698 N.E.2d 257, 265 (Ill. Ct. App. 1998). Contract formation also requires objective mutual assent. *Sgouros*, 817 F.3d at 1034. Mutual assent requires a meeting of the minds which can be revealed by words or acts. *Id.* Whether a party received reasonable notice of a contract's terms and unambiguously assented to those terms "is a fact-intensive inquiry." *Johnson*, 2017 WL 1155384, at *2; *see also Sgouros*, 817 F.3d at 1034-35. As part of the inquiry, a court considers "whether a reasonable person would be misled, confused, misdirected or distracted by the manner in which the terms and conditions are presented." *Johnson*, 2017 WL 1155384, at *2. A party seeking to unilaterally modify an existing contract must provide new consideration in order to prevent coercive modifications. *See Contempo Design, Inc. v. Chicago and N.E. Ill. Dist. Cncl. of Cptrs.*, 226 F.3d 535, 550 (7th Cir. 2000); *Doyle v. Holy Cross Hosp.*, 708 N.E.2d 1140, 1145 (Ill. Ct. App. 1999).

9

A.   **By Taking the PSAT, A.S. Did Not Agree to Arbitration, and Any Agreement Would Be Unconscionable.**

Defendant has failed to satisfy its burden of showing that A.S. agreed to Arbitration Provision 1 in connection with the PSAT Exams. Given that the State of Illinois and A.S.'s school mandated that A.S. take the PSAT Exams (*see* Exs. 3 and 4), it is reasonable to infer that any agreement for A.S. to take those exams was between Defendant and those public entities, not A.S.

Defendant has not shown that A.S. agreed to arbitration or was even aware of an arbitration provision when A.S. took the PSAT Exams. Defendant has provided no evidence that it provided, or even attempted to provide, A.S. with: (a) the "test guidelines and regulations" referenced in the PSAT answer sheets; or (b) the *Student Guide. See* Dkt. 60-6 (Hardy Decl.) (no mention of PSAT). Even if A.S. received the *Student Guide*, Defendant provides no evidence that the *Student Guide* and the "test guidelines and regulations" are one and the same. Defendant is not entitled to any inferences. Because A.S. could not have agreed to an arbitration agreement for which A.S. was unaware, no reasonable person signing the Certification Statement would think that it bound him to arbitration. *See Sgouros*, 817 F.3d at 1035.

If A.S. somehow agreed to Arbitration Provision 1, the circumstances under which that occurred were unconscionable. A contract may be unconscionable based on procedural or substantive unconscionability, or a combination of both. *Franks Maint. & Eng'r Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403, 410 (Ill. 1980). "Procedural unconscionability consists of some impropriety during the process of forming a contract depriving a party of a meaningful choice." *Id.* "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006). In determining procedural unconscionability, a court should consider "all the circumstances

10

surrounding the transaction including the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print." *Id.*

"Substantive unconscionability refers to those terms which are inordinately one-sided in one party's favor." *Razor*, 854 N.E.2d at 622. Factors that are indicative of substantive unconscionability are: (a) one-sided terms that unfairly surprise or oppress an innocent party; (b) an imbalance in the rights and obligations imposed by the agreement; and (c) significant cost-price disparity. *Kinkel v. Cingular Wireless, LLC*, 857 N.E.2d 250, 267 (Ill. 2006).

Procedural unconscionability precludes a finding that A.S. agreed to Arbitration Provision 1. As discussed above, Defendant, through exam proctors, required A.S. to agree to "test guidelines and regulations" never presented to A.S, thereby depriving A.S. of any meaningful choice. *See Razor*, 854 N.E.2d at 623. Notably, the actual information provided to A.S. made no mention of arbitration. Moreover, Arbitration Provision 1 "was entirely preprinted"; A.S., a minor and a consumer "had no hand in [the agreement's] drafting; and no bargaining power with respect to its terms"; and there was a vast inequity in the parties' ability to understand the transaction. *Id.; see also Crown Mortg. Co. v. Young*, 989 N.E.2d 621, 624 (Ill. App. Ct. 2013). Finally, the provision in question is intended to limit the drafter's liability." *Razor*, 854 N.E.2d at 623.

By mandating that A.S.: (a) incur the fees and expenses of arbitration (even though A.S.'s claims provide for attorneys' fees); (b) arbitrate in New York unless Defendant agrees otherwise; and (c) waive the ability to seek class action relief without the ability to reject that term, Arbitration Provision 1 is substantively unconscionable. *See Kinkel*, 857 N.E.2d at 274-75. Defendant tacitly concedes the substantive unconscionability of Arbitration Provision 1 by attempting to amend its terms. Dkt. 60 at 22 (agreeing to arbitrate in Chicago and pay all fees/expenses). But the Court

11

must rule on the unconscionable arbitration agreement purportedly presented to A.S. *See Kinkel*, 857 N.E.2d at 270.

Defendant seeks to preclude the Court from addressing unconscionability, contending that Arbitration Provision 1 clearly and unmistakably delegates the decision to the arbitrator by incorporating the AAA Rules. Dkt. 60 at 17-18 & n.11; *see Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S.Ct. 524, 530 (2019) (requiring clear and unmistakable evidence of agreement to delegate arbitrability issues to arbitrator). As a threshold matter, procedural unconscionability addresses whether A.S. agreed to Arbitration Provision 1 – *i.e.*, whether an agreement exists, *see Razor*, 854 Ill.2d at 622 – which is an issue for the Court to decide. *Johnson*, 2017 WL 1155384, at *1. Moreover, the Seventh Circuit has not addressed whether incorporation of AAA rules is sufficient to delegate the arbitrability question. Courts that have found that the incorporation of AAA rules into a contract constitutes clear and unmistakable evidence of intent to delegate the arbitrability question have typically done so where the agreement involves sophisticated parties. *See, e.g., Oracle Am., Inc. v. Myriad Grp A.G.*, 724 F.3d 1069, 1075 (9th Cir. 2013).[6] Defendant cannot contend that A.S. is a sophisticated party. Thus, the requisite intent does not exist.

The Court should reject the non-binding authority relied on by Defendant and find that there is not clear and unmistakable evidence that the parties have agreed to delegate arbitrability issues to an arbitrator, especially given: (a) A.S.'s status as a minor; and (b) the complexity of comprehending the boilerplate legalese in both Arbitration Provision 1 and the AAA Rules. *Doe v. The College Board*, No. 19 Civ. 6660 (LGS), 2020 WL 8822019 (S.D.N.Y. Feb. 24, 2020),

---

[6] *See also Nandorf, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 410 F.3d 882 (N.D. Ill. 2019); *Allscripts Healthcare, LLC v. Etransmedia Tech, Inc.*, 188 F.Supp.3d 696 (N.D. Ill. 2016); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205 (2d Cir. 2005); *Petrofac, Inc. v. DynMcDermott Pet. Operations Co.*, 687 F.3d 671 (5th Cir. 2012); *Terminex Int'l Co. v. Palmer Ranch LP*, 432 F.3d 1327 (11th Cir. 2005); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006), *abrogated on other grounds by Henry Schein, Inc.*, 139 S.Ct. 524; *Chevron Corp. v. Ecuador*, 795 F.3d 200 (D.C. Cir. 2015).

relied on by Defendant (*See* Dkt. 60 at 19), supports this conclusion. In a case involving the same arbitration provision at issue here, the court did not delegate the issue of arbitrability.[7] *Id.* at *5.

Recognizing that A.S. did not agree to arbitration in connection with the PSAT Exams, Defendant contends later arbitration agreements subject PSAT disputes to arbitration because the PSAT was a College Board "program." Dkt. 60 at 19. As discussed below, A.S. has not entered into any arbitration agreement with Defendant. Moreover, none of the arbitration provisions covers the PSAT. Defendant's own documents do not list the PSAT 8/9[8] as a College Board "program." *See* Ex. 2. Moreover, because Defendant did not define "program," the term must be construed against Defendant. *See Zwayer v. Ford Motor Credit Co.*, 665 N.E.2d 843, 846 (Ill. App. Ct. 1996). To the extent a factual dispute exists as to whether the PSAT 8/9 was a "program," a jury should resolve it.

### B. By Taking the 2019 AP Exams, A.S. Did Not Agree to Arbitration, and Any Agreement Would Be Unconscionable.

Defendant has failed to carry its burden of showing that A.S. agreed to Arbitration Provision 2 in connection with the 2019 AP Exams. An implied contract ("Implied Contract 1") governed the relationship between A.S. and Defendant with respect to those exams. An implied-in-fact contract "contains all of the elements of an express contract, as well as a meeting of the minds." *Brody*, 698 N.E.2d at 265. A party can prove the existence of an implied-in-fact contract

---

[7] Based on distinguishable facts, the court in *Doe* did not find procedural unconscionability. *Id.* *5. There, the plaintiffs actually sought to enforce College Board's terms while also arguing the terms were unconscionable. *Id.* Moreover, in *Doe,* the plaintiffs did not contend they did not receive or have time to review the terms – a critical difference from the facts in this case. *Id.* at *1, 5. Finally, *Doe* applied New York unconscionability law, which requires a showing of "grossly unreasonable" or "outrageous" conduct (*id.* at 6); Illinois law rejects that standard. *See Kinkel*, 857 N.E.2d at 269.

[8] The PSAT 8/9 is distinct from the PSAT/NMSQT which seemingly was a College Board program. *See* Ex. 2; Dkt. 55 (First Am. Compl.) ¶¶ 10.

by proving the essential elements of a contract as "conveyed by implication from the parties' conduct or actions." *Id.*

Here, Defendant, through A.S.'s school, offered A.S. the opportunity to earn college-level credit by taking AP classes and AP Exams. *See* Ex. 1 ¶ 7; Ex. 5. A.S. accepted the offer by signing up for AP classes and taking the classes and the AP Exams. A.S. provided consideration in the form of taking the AP classes, paying to take the AP Exams and taking those exams.

Defendant contends there was no meeting of the minds because A.S. paid A.S.'s school. Dkt. 60 at 16, n.10. But that improperly views the facts in the light most favorable to Defendant and ignores Defendant's conduct and actions – *e.g.*, offering its AP Program through the school (*see* Exs. 2, 6, 8, 10) and using the school to provide information to students (*see, e.g.,* Dkt. 60-6). Defendant's own documents establish its control over the payment collection method. *See* Ex. 7 at 23; Ex. 11 at 20. Whether Defendant deputized the school as an agent, contractor or other title, the facts show that Defendant made an offer to A.S., which A.S. accepted by taking AP classes and signing up and paying for AP Exams. *Brody*, 698 N.E.2d at 265. A jury should decide any dispute about these facts. *See Weber-Stephen Products Co. v. U.S. Die Casting and Develop.*, No. 89 C 329, 1989 WL 105223, at *4 (N.D. Ill. Sept. 1, 1989) (meeting of minds is a question of fact).

As discussed in more detail below, Defendant's contention that the *2018-2019 Bulletin* superseded Implied Contract 1 (Dkt. 60 at 16-17) ignores that A.S. did not agree to the terms therein, generally, or to arbitration, specifically. *See Ogle v. Hotto*¸ 652 N.E.2d 815, 819 (Ill. Ct. App.. 1995) (no merger where no written contract). Moreover, Defendant did not provide any new consideration in support of it attempted unilateral and coercive modifications to the existing contract. *See Contempo Design, Inc.*, 226 F.3d at 550.

Absent Implied Contract 1, Defendant still has failed to satisfy its burden. Viewed in the proper light, the evidence and inferences show that A.S. had no knowledge of the terms within the *2018-2019 Bulletin* when A.S. took the 2019 AP Exams. A.S. first received the *Bulletin* in an email sent just days before the exams. The *Bulletin* was not emphasized and not even mentioned until the last sentence of the lengthy single-spaced email. The email gave no indication that the *Bulletin* contained contract terms or an arbitration provision.

While A.S. signed an answer sheet in connection with each 2019 AP Exam, A.S. did so at the exam proctor's direction, not because A.S. agreed with any terms or had any meaningful choice. To the extent A.S.'s signature is indicative of an agreement with Defendant, the agreement is limited to test security and score validity issues – the items described on the answer sheet. *See* Dkt. 60-2 to 4. Fairly read, the agreement has nothing to do with arbitration, *see Bank of Com. v. Hoffman*, 829 F.3d 542, 548 (7th Cir. 2016) (fair reading preferred), a conclusion underscored by the fact that the *Bulletin* had distinct sections for "Test Security and Administration Policies and Procedures" and "Disputes." *See* Dkt. 60-7 at 6-8.

On these facts, a reasonable person could not conclude that A.S. unambiguously assented to Arbitration Provision 2 or that Defendant did not mislead A.S. into signing the answer sheets. *See Johnson*, 2017 WL 1155384, at *2. To the extent a dispute exists, a jury should resolve it. *See KMK Group, LLC v. Helco Corp.*, 380 F.Supp.3d 790, 796 (N.D. Ill. 2019).

Finally, just as Arbitration Provision 1 is substantively unconscionable, so, too, is Arbitration Provision 2; they are substantively the same. Moreover, the above facts epitomize procedural unconscionability. After A.S. prepared for months to take the AP Exams and paid for them, Defendant sought to inject onerous new terms into the agreement on the eve of the AP Exams. In a highly structured and stressful exam setting, Defendant, through exam proctors,

15

directed A.S. to sign what it now claims was an arbitration agreement – even though the written words do not support that interpretation. Defendant did not ensure that A.S. ever saw the actual arbitration agreement.

### C. A.S. Did Not Agree to Arbitrate in Connection with the 2020 AP Exams, and Any Agreement Would Be Unconscionable.

Defendant has failed to carry its burden of showing that A.S. agreed to Arbitration Provisions 2 and 3 in connection with the 2020 AP Exams. Defendant's primary evidence of A.S.'s purported agreement is the Declaration of James A. Clewley Jr. Dkt. 60-8. Other than Mr. Clewley stating his title, he presents no foundation establishing his competency to testify to the facts in his declaration. *See id.* The Court should strike his testimony and find Defendant failed to carry its burden. Even if Mr. Clewley's testimony is considered, the result is the same.

### 1. My AP.

Defendant's contention that A.S. agreed to Arbitration Provision 2 by registering for My AP (Dkt. 60 at 16) lacks merit. Prior to signing up for My AP, A.S. accepted Defendant's offer to participate in the 2019-2020 AP Program by signing up for three AP classes and paying for three AP Exams ("Implied Contract 2).[9] *Compare* Ex. 10 and Dkt. 60-8 ¶ 7. Defendant provided no new consideration for its attempted unilateral and coercive modification of the terms of the implied contract. *Contempo Design, Inc.*, 226 F.3d at 550.

Moreover, Defendant has failed to show A.S.'s unambiguous assent to My AP's terms. The facts and inferences show that, at Defendant's direction, A.S.'s teachers instructed A.S. to sign up for My AP in order to participate in AP classes, which A.S. did. Far from agreeing to My AP's

---

[9] The agreement of A.S.'s school district to cover AP Exam fees has no impact on Implied Contract 2. Indeed, to the extent Defendant contends that payment from the school district is evidence of an agreement between the district and Defendant for students to take the exams, Defendant cannot also contend that a separate agreement exists between students and Defendant covering the same subject matter.

terms, A.S. merely completed teachers' assignments – something A.S. had to do. Further, the initial screen on My AP's registration page was misleading and confusing; it failed to notify the reader of any arbitration provision, and the scope of the agreement shown on the opening screen was much narrower than the scope of Arbitration Provision 2. The ambiguity in scope is construed against Defendant. *See Zwayer*, 665 N.E.2d 843 at 846. Based on these facts, a reasonable person could not conclude that A.S. unambiguously assented to the My AP terms or that Defendant did not mislead, confuse and misdirect A.S. into accepting those terms. *See Johnson*, 2017 WL 1155384, at *2; *Sgouros*, 817 F.3d at 1035.

The above facts also demonstrate procedural unconscionability. Deceiving minors into entering into a contract under the guise of a school assignment defines unconscionability and precludes any contention that A.S. had a meaningful choice in the matter.[10]

### 2. 2020 AP Exams.

Defendant has also failed to show that A.S. agreed to arbitrate by taking the 2020 AP Exams. Again, Implied Contract 2 controls, and Defendant provided no new consideration to unilaterally and coercively modify it. *Contempo Design, Inc.*, 226 F.3d at 550. Moreover, the facts and inferences show that A.S. did not agree to arbitrate or, at best, a dispute of material fact exists. A.S. informed Defendant that by taking the 2020 AP Exams, A.S. was not agreeing to arbitrate and, if forced to accept any terms, A.S. would do so under duress and protest, reserving all rights. Dkt. 60-14. Defendant let A.S. take the exams subject to those conditions, thereby accepting them.[11] Finally, after A.S. dutifully performed A.S.'s obligations under Implied Contract 2 all

---

[10] As discussed above, Arbitration Provision 2 is substantively unconscionable.

[11] In response to A.S.'s notice, Defendant: (a) claimed it provided sufficient time for students to review the exams' terms; and (b) disagreed with A.S.'s "characterization of the legal effect of [Defendant's] arbitration agreements." *Id.* A.S. did not characterize the arbitration agreements' legal effects, but rather made clear that A.S. did not agree to arbitrate. *See* Dkt. 60-14.

school year, shortly before the AP Exams, Defendant forced A.S. to "accept" unilateral modifications to the existing contract under draconian circumstances. Based on these facts, a reasonable person could not conclude that: (a) A.S. unambiguously assented to Arbitration Provision 3; or (b) the manner in which Defendant presented those terms would not have confused or distracted him or her. *See Johnson*, 2017 WL 1155384, at *2; *Sgouros*, 817 F.3d at 1035. These facts also show the procedural unconscionability of the process – A.S. was given no meaningful choice.

Arbitration Provision 3 was also substantively unconscionable because it limited A.S.'s ability to obtain redress in a cost-effective manner. *See Kinkel*, 857 N.E.2d at 274. The provision precluded class action litigation without giving A.S. a chance to reject that term, and it precluded A.S. from recovering attorneys' fees, even though Defendant's conduct violated statutes allowing for those fees. *See* Dkt. 55 (Am. Compl.) at Cts. 7-11.

## III. The Arbitration Provisions Are Inapplicable.

Even if A.S. agreed to arbitrate, the arbitration provisions do not cover many of the issues in this case. In relevant part, the provisions are limited to: (a) registering for and taking part in a College Board program; (b) registering for or taking the PSAT or 2020 AP Exams; and (c) Defendant's "use" of test taker data. Dkt. 60-7 at 8; 60-17 at 8; Ex. 14 at 7. The provisions do not cover Defendant's conduct in connection with A.S.'s visits to Defendant's website or registration for an online account. Moreover, A.S. does not challenge Defendant's "use" of A.S.'s data. Rather, A.S. challenges Defendant's unlawful collection, sale and dissemination of the data. Regarding the unlawful data disclosures, Defendant's agreements distinguish between "use," on the one hand, and disseminating, sharing or disclosing, on the other. *See, e.g.,* Ex. 14 at 4 ("College Board may share"), 5-6 ("College Board will not use or disclose"), 7 ("use of test taker data"); Dkt. 60-7 at 8

18

("use of test taker data"), 4 (personal information may be "shared"). Courts are required to give meaning to every word in the agreement, if possible. *See Cabrini-Green Local Adv. Council v. Chicago Housing Auth.*, No 04 C 3792, 2008 WL 4679364, at *5 (N.D. Ill. May 30, 2008). Thus, the Court must ascribe a meaning to the term "use" that is different from verbs indicating the disclosure of data.

## IV.    While A.S. Can Disaffirm Contracts, There Are None to Disaffirm.

Defendant argues that A.S. cannot disaffirm the arbitration agreements. Dkt. 60 at 22-24. As discussed above, there are no agreements for A.S. to disaffirm and, thus, A.S. has not sought to do so. While any discussion of disaffirmance is hypothetical, Defendant's application of the law is incorrect and bears correcting.

First, it is simply contrary to Illinois law that a minor cannot disaffirm a contract for which he or she has accepted benefits. *See Iverson v. Scholl, Inc.*, 483 N.E.2d 893, 897 (Ill. App. Ct. 1985); *Hunter v. Egolf Motor Co.*, 268 Ill.App. 1, 6 (Ill. Ct. App. 1932). The public policy protections afforded minors are so strong that a minor can disaffirm even when doing so creates an unjust result or when the contract has been fully executed and consideration would be lost. *See id.*; *see also Weisbrook v. Clyde C. Netzley, Inc.*, 374 N.E.2d 1102, 1104, 1106-07 (Ill. Ct. App. 1978) (17-year-old disaffirming car purchase after using and damaging car) (citing cases); *Bloom v. ACT, Inc.*, No. CV 18-6749-GW(SSx) (C.D. Cal. Mar. 7, 2019), Dkt. 126 at 4-8 (allowing disaffirmance where previous benefits accepted).[12]

Second, each of the cases that Defendant relies upon for its claim that Plaintiff could not disaffirm is distinguishable because the cases involved minors who: (1) continued to accept

---

[12] Defendant cites a previous order in *Bloom* in support of compelling arbitration. Dkt. 60 at 22. However, the court later vacated its decision to compel arbitration because the minor plaintiffs subsequently submitted disaffirmance letters. *Bloom* Dkt. 126 at 8.

benefits from the agreements after filing suit, *C.M.D. ex rel. DeYoung v. Facebook, Inc.*, 621 F.App'x 488, 489 (9th Cir. 2015); *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F.Supp.2d 894, 900 (S.D. Ill. 2012); (2) sought to enforce the contract allegedly disaffirmed or rights attained thereunder, *Harden v. Am. Airlines*, 178 F.R.D. 583, 587 (M.D. Ala. 1998); *Sheller ex rel. Sheller v. Frank's Nursery & Crafts, Inc.*, 957 F.Supp. 150, 154 (N.D. Ill. 1997); or (3) did not seek disaffirmance, *Doe*, 2020 WL 882019; *Durrett v. ACT, Inc.*, 310 P.3d 1047, at *8-9. (Haw. Ct. App. 2011).[13] Here, Defendant contends A.S. entered into a discrete agreement for each exam and does not contend A.S. continues to accept benefits from any of those agreements. *See* Dkt. 60 at 23 ("[A.S.] has accepted benefits" – past tense). Any additional benefits would derive from new agreements. Because A.S. has not sought to disaffirm the non-existent agreements at issue in this case, any contention that A.S. is simultaneously seeking to enforce and disaffirm an agreement would be purely academic. Dkt. 60 at 23.

## CONCLUSION

For the foregoing reasons, Mark S. respectfully requests that the Court deny Defendant's motion and order a jury trial on all issues of disputed material fact.

---

[13] *Biederman v. O'Connor*, 7 N.E. 463, 467 (Ill. 1886), is inapposite as the plaintiff in that case sought to enforce a contract for which the plaintiff failed to perform.

## CERTIFICATE OF SERVICE

I, Scott R. Drury, an attorney, hereby certify that, on July 2, 2020, I filed the foregoing

document using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Scott R. Drury
SCOTT R. DRURY
*One of Plaintiff's Attorneys*